## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 17-433 |
| TYLER ELLIS | : | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Tyler Ellis seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the fact that he does not present a medical condition that, according to CDC guidance, places him at enhanced risk during the current pandemic and, otherwise, has not demonstrated "extraordinary and compelling reasons" that warrant the relief sought.

## I.    Background.

### A.    Criminal Conduct.

Beginning in or around April 2016 and on numerous occasions afterwards, personal identification information ("PII") belonging to Sam's Club members and AT&T subscribers was illegally accessed and stolen. Fraudulently obtained PII belonging to AT&T subscribers were added to existing Sam's Club members' accounts on Sam's Club's website. Within minutes of the addition of the PII to the Sam's Club members' accounts on the website, the defendant  appeared in Sam's Club stores with counterfeit

identification documents bearing his image and the stolen or fraudulently obtained PII

that had been added to the Sam's Club members' accounts online as the secondary user

of the Sam's Club membership account. The defendant obtained Sam's Club membership

cards for those Sam's Club members' accounts. The defendant used the newly obtained

Sam's Club membership cards to obtain new iPhones that were fraudulently registered to

the accounts of approximately 43 AT&T subscribers and charged to the subscribers. The

total value of the fraudulently obtained iPhones was more than $170,000.

On August 17, 2017, the defendant was charged in a multi-count indictment with

charges related to his fraudulent activities. The defendant's fraudulent actions caused the

transmission of writings, signals, or sounds in interstate commerce to Sam's Club and

AT&T websites/servers when he obtained the membership card and iPhones at Sam's

Club stores, in violation of 18 U.S.C. § 1349 (Wire Fraud Conspiracy – Count One).

Using counterfeit identification documents and existing Sam's Club members' account

numbers at locations in the Eastern District of Pennsylvania, the defendant obtained

Sam's Club membership cards and iPhones, in violation of 18 U.S.C. §§ 1029(a)(2),

1343, and 2 (Wire Fraud – Counts Two through Nine and Access Device Fraud – Count

Ten). The defendant also stole or fraudulently obtained and used the PII of numerous

individuals when he engaged in the wire and access device fraud transactions in the

Eastern District of Pennsylvania, in violation of 18 U.S.C. §§ 1028A and 2 (Aggravated

Identity Theft – Counts Eleven through Eighteen).

On April 27, 2018, the defendant entered a plea of guilty to the charged offenses

and accepted responsibility for the fraudulent activities. On August 8, 2019, this Court

imposed a sentence of 57 months' imprisonment, a term of three years' supervised

release, restitution of $177,413, and a special assessment of $1,800. At the time the Court

imposed this sentence, the defendant presented no significant medical conditions.

The defendant is serving his sentence at FCI Fort Dix, with an anticipated release

date of February 12, 2022. He has served approximately 35 months, has credit for good

conduct time of approximately four months, for total time served of approximately 39

months. The defendant's disciplinary history while in custody reveals infractions for

refusing an order and interference with prison personnel in the taking of prisoner count,

which resulted in telephone and commissary restrictions.

### B.    Request for Compassionate Release.

The bases for the defendant's motion for compassionate release is two-fold. First,

the defendant expressed general concern about contracting COVID-19, rather than

describing any medical ailment. He presented no medical condition which justifies his

request for release. Second, the defendant stated that he wanted to take care of his father,

but he provided no details about why his assistance was needed, or why he would be the

only available caretaker. None of the circumstances presented by the defendant

demonstrates the "extraordinary and compelling reason" required by the statute for

release.

### C.    BOP's Response to the COVID-19 Pandemic.

As this Court is well aware, COVID-19 is an extremely dangerous illness that has

caused many deaths in the United States in a short period of time and that has resulted in

massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms, and also placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, all facility staff are screened for symptoms, through daily temperature checks and mandatory self-reporting of symptoms.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent

authorization by the Deputy Director of BOP. Any contractor or volunteer who requires

access will be screened for symptoms and risk factors.

Social visits were stopped as of March 13, and remain suspended at this time, to

limit the number of people entering the facility and interacting with inmates. In order to

ensure that familial relationships are maintained throughout this disruption, BOP has

increased detainees' telephone allowance to 500 minutes per month. Tours of facilities

are also suspended. Legal visits are very limited, but permitted on a case-by-case basis

after the attorney has been screened for infection in accordance with the screening

protocols for prison staff.

Further details and updates of BOP's modified operations are available to the

public on the BOP website at a regularly updated resource page:

www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates

who are most vulnerable to the disease and pose the least threat to the community, BOP

is exercising greater authority to designate inmates for home confinement. On March 26,

2020, the Attorney General directed the Director of the Bureau of Prisons, upon

considering the totality of the circumstances concerning each inmate, to prioritize the use

of statutory authority to place prisoners in home confinement. That authority includes the

ability to place an inmate in home confinement during the last six months or 10% of a

sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home

confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under

the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020,

BOP may "lengthen the maximum amount of time for which the Director is authorized to

place a prisoner in home confinement" if the Attorney General finds that emergency

conditions will materially affect the functioning of BOP. Pub. L. No. 116-136,

§ 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3,

2020, the Attorney General gave the Director of BOP the authority to exercise this

discretion, beginning at the facilities that thus far have seen the greatest incidence of

coronavirus transmission. As of this filing, the total number of inmates placed in home

confinement from March 26, 2020, to the present (including inmates who have completed

service of their sentence) is 20,053.[1]

Taken together, all of these measures are designed to mitigate sharply the risks of

COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring

the pandemic and to adjust its practices as necessary to maintain the safety of prison staff

---

[1]  This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, No. CR 08-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

and inmates while also fulfilling its mandate of incarcerating all persons sentenced or

detained based on judicial orders.

BOP's aggressive efforts have extended to FCI Fort Dix, the largest U.S. federal

prison in terms of capacity. At FCI Fort Dix, which currently houses 2,745 inmates, there

was an early outbreak in May, in which 36 inmates at the camp that is part of the

institution tested positive for COVID-19. All recovered, and there was no death at the

facility. At the time, a federal court in New Jersey rejected an action brought against the

facility seeking declaratory, injunctive, and habeas relief, presenting a detailed opinion

recounting BOP's efforts. *Wragg v. Ortiz*, 2020 WL 2745247 (D.N.J. May 27, 2020). At

that time, and as the months passed, there was no positive case at all in the far larger FCI.

Courts recognized this. *See, e.g.*, *United States v. Phillips*, 2020 WL 5076753, at *4 (E.D.

Pa. Aug. 27, 2020) (Surrick, J.) ("The efforts made by the BOP at FCI Fort Dix have

proven successful."); *United States v. Moses*, 2020 WL 5117978, at *4 (E.D. Pa. Aug. 31,

2020) (Padova, J.).

Then, additional and larger outbreaks began in October. At present, there are 789

reported cases in the entire institution, and a total of 530 current inmates are deemed

recovered. It remains the case that there has been no COVID-related death.

## II.    Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the

First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not
> modify a term of imprisonment once it has been imposed except that—

(1)  in any case—

(A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)  extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[2]

---

[2]  Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides

that the Court may grant release if "extraordinary and compelling circumstances" exist,

"after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are

applicable," and the Court determines that "the defendant is not a danger to the safety of

any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies

the "extraordinary and compelling reasons" that may justify compassionate release. The

note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the
> requirements of subdivision (2) [regarding absence of danger to the community],
> extraordinary and compelling reasons exist under any of the circumstances set
> forth below:
>
> (A)     Medical Condition of the Defendant.—
>
> (i)     The defendant is suffering from a terminal illness (i.e., a serious and
> advanced illness with an end of life trajectory). A specific prognosis
> of life expectancy (i.e., a probability of death within a specific time
> period) is not required. Examples include metastatic solid-tumor
> cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease,
> and advanced dementia.
>
> (ii)    The defendant is—

---

inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

       (I)      suffering from a serious physical or medical condition,

       (II)     suffering from a serious functional or cognitive impairment, or

       (III)    experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)    Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)    Family Circumstances.—

       (i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

       (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

The defendant is not eligible for compassionate release, because he does not present an "extraordinary and compelling reason" as stated in the governing guideline policy statement. The defendant does not present any of the health or family circumstances identified in the guideline, and instead presents a concern only based on the risk of acquiring COVID-19 in the prison environment. But the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). *See also United States v. Roeder*, 807 F. App'x 157, 160-61 (3d Cir. 2020) (per curiam) (not precedential) ("the existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence."), *id.* at 161 n.16 ("Similarly, the existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."). *See also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D.

Ind. Dec. 4, 2020) ("the presence of COVID-19 in a prison, even in large numbers, does

not justify compassionate release on its own.").[3]

### A.      The Defendant Lacks a Medical Reason Justifying Release.

The defendant is a healthy 34-year-old male, who has not presented any medical

ailment in support of his request for compassionate release. The government obtained the

defendant's medical records from the Bureau of Prisons and those records show that he

has no chronic ailments and takes no prescription medications.

On July 21, 2020, the defendant presented himself to Health Services at FCI Fort

Dix. He said he had "SOB [shortness of breath] when exercising and wearing the mask

and also sleeping at night . . . Patient states this wakes him up at night, makes him

nervous and he has difficulty breathing. Patient stated he had a Hx [history] of asthma

that was under control when he was ten yo [years old] and he thinks his asthma is flaring

up for the past month."

The timing of the defendant's complaints is suspicious. The government has seen

other instances of inmates appearing during the pandemic, in advance of seeking

compassionate release, and stating a condition they had not previously reported. At the

---

[3] *See also, e.g.*, *United States v. Williams*, 2020 WL 4001045, at \*2 (E.D. Pa. July 14, 2020) (Bartle, J.) (denied for inmate who presents no health conditions); *United States v. Cato*, 2020 WL 4193055, at \*2 (E.D. Pa. July 21, 2020) (Beetlestone, J.) (same); *United States v. Moore*, 2020 WL 4193012, at \*1 (E.D. Pa. July 21, 2020) (Pappert, J.) (same); *United States v. Ramirez-Ortega*, 2020 WL 4805356, at \*2 (E.D. Pa. Aug. 18, 2020) (DuBois, J.) (same); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors).

time the defendant made his complaints, the examiner noted that the defendant had not

reported a history of asthma during his intake to the prison, when a thorough review and

examination are conducted. Also, he was fine on physical examination on July 21, with

normal vital signs, breathing, etc. Nevertheless, the examiner ordered an EKG and chest

x-ray. The EKG was normal. The result of the x-ray, on July 28, was:

> No acute cardiopulmonary disease. Lungs are clear.
>
> Heart size appears mildly enlarged. This may be due to low lung volume status accentuating the cardiac silhouette. A follow-up PA view chest with good inspiratory effort suggested to reassess cardiac size. No evidence for congestive heart failure.

The defendant has not presented any subsequent complaints.

Accordingly, notwithstanding the numbers of COVID-19 cases at Fort Dix, the

defendant has not presented a risk factor that justifies his release.

**B.     The Defendant's Concern for His Father Does Not Justify Release.**

In his motion for compassionate release and during the hearing held on January 6,

2021, the defendant expressed concern for his father and provided oral representations as

to his father's medical ailments. Many of the oral representations were repetitious of the

representations made about his father at the defendant's sentencing hearing and taken into

consideration by this Court at that time. At no time has the defendant indicated that his

father requires a caretaker, lost his caretaker, or that the defendant is the only available

caretaker.

Understandably, the defendant has concern for his father, but the familial

relationship does not meet one of the criteria identified in the subject guideline policy

- 14 -

statement. *See, e.g.*, *United States v. Gaskin*, 2020 WL 7263185, at *4 (E.D. Pa. Dec. 9,

2020) (Pratter, J.) (the desire to care for elderly parents does not qualify as

extraordinary); *United States v. Goldberg*, 2020 WL 1853298, at *4 (D.D.C. Apr. 13,

2020) (desire to help care for elderly parents is admirable but does not qualify under the

application note); *United States v. Ingram*, 2019 WL 3162305 (S.D. Ohio July 16, 2019)

(compassionate release motion premised on inmate's desire to care for his 93-year-old

mother denied, as she was in hospice and had other relatives to care for her; court states:

"Many, if not all inmates, have aging and sick parents. Such circumstance is not

extraordinary."); *United States v. Henry*, 2020 WL 3791849, at *4 (E.D.N.Y. July 6,

2020) ("Care of parents is not a qualifying basis for release.").

Further, even if this could be a qualifying basis, the defendant has not established

that he is the only available person to provide care that his father needs. He has not

shown any extraordinary circumstance. *See, e.g.*, *United States v. Siberio-Rivera*, 2020

WL 7353367, at *1 (E.D. Pa. Dec. 15, 2020) (Pappert, J.) ("[j]udges in this District have

yet to find care for elderly or ill parents r[i]ses to the level of extraordinary and

compelling circumstance warranting release."); *United States v. Crandle*, 2020 WL

2188865, at *4 (M.D. La. May 6, 2020) (failed to present evidence that he is only

caregiver for ailing parents).

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney

*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

*/s Anita Eve*
ANITA EVE
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that this pleading has been served on the Filing User identified

below through the Electronic Case Filing (ECF) system:


> Gavin P. Holihan, Esquire
> gphesq@ptd.net


> */s Anita Eve*
> ANITA EVE
> Assistant United States Attorney


Dated:  January 11, 2021.